## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **CHASSIDY A. COVEY,** | ) | |
| Plaintiff | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 7:18cv00601 |
| | ) | **MEMORANDUM OPINION** |
| **ANDREW SAUL,[1]** | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### *I. Background and Standard of Review*

Plaintiff, Chassidy A. Covey, ("Covey"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Covey protectively filed an application for SSI on February 2, 2015, alleging disability as of January 5, 2006, based on insomnia, degenerative disc disease, arthritis in her back and anxiety. (Record, ("R."), at 161, 163-70, 183.) The claim was denied initially and upon reconsideration. (R. at 61-68, 69, 70-78, 79, 80-82, 87-91.) Covey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 94-96.) A hearing was held on July 18, 2017, at which Covey was represented by counsel. (R. at 29-60.)

By decision dated November 8, 2017, the ALJ denied Covey's claim. (R. at 16-24.) The ALJ found that Covey had not engaged in substantial gainful activity since February 2, 2015, the application date. [2] (R. at 18.) The ALJ determined that Covey had severe impairments, namely carpal tunnel syndrome status post bilateral release surgeries, degenerative disc disease, obesity and diabetes mellitus, but he found that Covey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. (R. at 18, 20.) The ALJ found that Covey had the residual functional capacity to perform sedentary[3] work which required no more than frequent balancing

---

[2] Thus, the relevant time period for determining disability is from January 5, 2006, the alleged onset date, through November 8, 2017, the date of the ALJ's decision.

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined

and occasional crouching, kneeling, stooping and climbing ramps and stairs and no climbing ladders, ropes or scaffolds. (R. at 20-23.) The ALJ found that Covey was not able to perform any of her past relevant work. (R. at 23.) Based on Covey's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Covey could perform, including the jobs of an order clerk, a date checker and a medical supplies assembler. (R. at 23-24.) Thus, the ALJ concluded that Covey was not under a disability as defined by the Act, and was not eligible for SSI benefits. (R. at 24.) *See* 20 C.F.R. § 416.920(g) (2019).

After the ALJ issued his decision, Covey pursued her administrative appeals, (R. at 10, 12), but the Appeals Council denied her request for a review. (R. at 1-3.) Covey then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2019). This case is before this court on Covey's motion for summary judgment filed June 27, 2019, and the Commissioner's motion for summary judgment filed July 12, 2019.

## II. Facts

Covey was born in 1981, (R. at 33), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She graduated high school and attended college for one year. (R. at 38.) Covey has past relevant work experience as a sandwich maker and in manufacturing plants. (R. at 34-36.) Covey testified that the primary

---

as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2019).

impairment that prevented her from working was her back pain. (R. at 38.) Covey described it as constant, numbing and stabbing pain. (R. at 38.) Covey said that she injured her back when she was 12 years old. (R. at 38.) Covey said that her legs would ache and go numb. (R. at 39.) Covey testified that everything she did – sitting, standing, walking – made her back pain worse. (R. at 40.) Covey said that she spent most of her days changing positions from siting to lying to standing and walking. (R at 40.) Covey testified that she took Lortab #10 and cortisone shots for her back pain. (R. at 41.)

Covey also testified that she suffered from TMJ on the right side of her face and her jaw. (R. at 42.) She said that she took naproxen for her TMJ symptoms. (R. at 42.) She testified that she had carpal tunnel release surgeries on both wrists in 2015, which cured her symptoms. (R. at 42-43.) Covey also testified that she suffered from anxiety. (R. at 43.) She said that she sometimes had trouble leaving her home. (R. at 44.) Covey said that she took Prozac for her anxiety. (R. at 43.) Covey also testified that she had recently begun having seizures. (R. at 51.) She said that she had never sought emergency medical treatment for these seizures. (R. at 52.)

Mark A. Hileman, a vocational expert, also testified at Covey's hearing. (R. at 53-58.) Hileman testified that Covey's prior work as a sandwich maker as unskilled light[4] work, her work as a plating equipment tender as semi-skilled medium[5] work and her work as a hand packager as unskilled medium work. (R. at

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2019).

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2019).

54.) Hileman was asked to assume a hypothetical individual of Covey's age, education and work history, who could perform light work with frequent balancing, occasional crouching, kneeling, stooping and climbing ramps and stairs and who could not climb ladders, ropes or scaffolds. (R. at 54.) Hileman said that such an individual could perform Covey's past work as a sandwich maker. (R. at 55.) He also said that there were other jobs available that this person could perform, such as work as a cafeteria attendant, a routing clerk and a marker. (R. at 55.) Hileman said that, if this person was limited to frequent use of the upper extremities for fine manipulation, she could not perform the sandwich maker job. (R. at 55.)

Hileman was asked to consider a second hypothetical person of Covey's age, education and work history, who could perform sedentary work with frequent balancing, occasional crouching, kneeling, stooping and climbing ramps and stairs and who could not climb ladders, ropes or scaffolds. (R. at 56.) He said that there were other jobs available that this person could perform, such as work as an addressing clerk, a callout operator and a stuffer. (R. at 56.) Hileman was asked to consider a third hypothetical person, limited as the second hypothetical, but who also could not work with the general public and who was limited to frequent use of the upper extremities for gross handling and fine manipulation. (R. at 56.) He said that such a person could perform the stuffer job and the addressing clerk job. (R. at 57.) He said that such a person also could perform work as a printed circuit board touch-up screener. (R. at 57.)

Hileman was asked to consider a fourth hypothetical person, limited as the third hypothetical, but who also could not work with the general public and who was limited to occasional use of the upper extremities for gross handling and fine

manipulation. (R. at 57.) He said that there would be no jobs that such a person could perform. (R. at 57.) Hileman also testified that there would be no jobs for a person who could sit only two hours and stand and walk only two hours in a workday. (R. at 58.) Hileman said that there would be no jobs available for a person who consistently missed two or more days of work each month. (R. at 58.)

In rendering his decision, the ALJ reviewed records from Dr. R. S. Kadian, M.D., a state agency physician; Dr. Margaret Burke, M.D., a state agency physician; Hillel Raclaw, Ph.D., a state agency psychologist; Carilion Clinic; New River Medical Group; Blue Ridge Pain Management Associates; Mary E. Tekesky, P.A.-C.: Dr. Anthony A. McPherron, D.O.; LewisGale Hospital Pulaski emergency department; and Melinda Barber, F.N.P.

Covey treated with Ida Sutherland, F.N.P. and Dr. Yung C. Chan, M.D., with New River Medical Group, from October 25, 2013, to June 9, 2016, for complaints of pain in her left thumb, coughs, urinary tract infection, upper respiratory infection, inflamed earlobe, sore toe, depression, anxiety and not sleeping well. (273-81, 318-329.) On April 23, 2015, Covey requested an increase in Klonopin because Social Services was handling problems with her son. (R. at 329.) It was noted that Covey answered questions appropriately, made good eye contact and walked with no difficulty. (R. at 329.) The provider noted no anxious or depressed mood. (R. at 329.) Nonetheless, Covey was diagnosed with anxiety and depression and given prescriptions for Prozac and Klonopin. (R. at 329.)

On August 24, 2015, Covey complained of no motivation to do anything. (R. at 327.) She complained that the Prozac "worked at first but then stopped." (R. at

327.) Sutherland noted that Covey made good eye contact with communication and answered questions appropriately. (R. at 327.) Sutherland noted no evidence of depressed or anxious mood. (R. at 327.)

Covey saw Dr. Chan for removal of a squamous cell cancerous mole and follow-up for infection of the site on December 14, 2015, January 7, January 14 and January 28, 2016. (R. at 321, 323-25.) On March 21, 2016, Covey told Sutherland that she was feeling anxious and depressed and not sleeping at all. (R. at 319.) Sutherland noted that Covey made good eye contact with communication and answered questions appropriately. (R. at 319.) She noted no appearance of anxiety or depression in Covey. (R. at 319.) On June 9, 2016, Covey complained of continuing insomnia, but Sutherland noted that a recent sleep study showed no sleep apnea and no insomnia because Covey slept well. (R. at 318.) Sutherland noted no appearance of anxiety or depression, yet she diagnosed depression and generalized anxiety. (R. at 318.) She discontinued Covey's prescription for Risperdal and prescribed trazodone. (R. at 318.)

X-rays of Covey's lumbar spine taken on January 30, 2014, show mild scoliosis and minimal degenerative arthritic changes. (R. at 311.)

Covey treated with Dr. George M. Baylor, M.D., with Blue Ridge Pain Management Associates, ("Blue Ridge"), for complaints of low back and leg pain from February 5, 2014, to January 24, 2017. (R. at 286-310, 313-16, 331-57.)  On February 5, 2014, Covey complained of low back and bilateral leg pain, right more than the left. (R. at 286.) She rated her pain as a seven on a 10-point scale. (R. at 286.) She said her pain would come and go, and she described it as having both a

dull and sharp quality. (R. at 286.) Covey said her pain improved with rest and increased with activity. (R. at 286.) Dr. Baylor noted that radiographic images showed degenerative disc disease with annular disc bulges at multiple levels of her lumbar spine. (R. at 286.) He noted no significant change from images taken in 2010. (R. at 286.) Covey complained of limitation of motion and back pain, spasms and stiffness, but she denied any joint swelling, muscle cramps, painful joints, leg cramps or neck pain. (R. at 287.) She also denied any anxiety or depression. (R. at 287.) Covey's physical examination of her lumbosacral spine revealed tenderness, moderately limited range of motion, some paraspinal muscle spasm with mildly reduced paraspinal muscle tone and positive straight leg raise test on the right. (R. at 287.) Dr. Baylor noted some weakness present and decreased tone, but no atrophy or abnormal movement of Covey's lower extremities. (R. at 288.) He noted that Covey had a normal gait and was able to stand without difficulty. (R. at 288.) He also noted normal mood and appropriate affect. (R. at 288.) Dr. Baylor prescribed Lortab for Covey's pain. (R. at 289.) Dr. Baylor performed lumbar paravertebral facet joint injections with fluoroscopy on Covey on February 27 and March 25, 2014. (R. at 289, 291.)

Covey returned to see Dr. Baylor on April 25, 2014, and his notes are almost identical to his notes of the previous visit. (R. at 293-95.) On this occasion, Dr. Baylor prescribed Klonopin and Norco and recommended that Covey undergo a lumbar radiofrequency ablation under fluoroscopy. (R. at 295.) Covey saw Dr. Baylor again on May 30, 2014, and his notes are almost identical to the notes of the previous two visits. (R. at 296-98.) Dr. Baylor noted that Covey was awaiting insurance approval to obtain the ablation procedure. (R. at 296.)

On Covey's July 25, 2014, visit, Baylor's notes mimic those he made on previous visits, except that Covey also complained of hurting her knee recently while playing basketball with her children. (R. at 299-301.) Dr. Baylor's notes of Covey's October 24, 2014, office visit are almost identical to his previous notes, except these contain a mention of knee pain upon motion and limited range of motion. (R. at 302-04.) On January 21 and April 15, 2015, Covey rated her back pain as only a five on a 10-point scale; otherwise, Dr. Baylor's notes were consistent with those made on Covey's previous visit. (R. at 305-10.) On January 21, 2015, Dr. Baylor stated that Covey had a permanent restriction against climbing stairs on a regular basis. (R. at 307.)

Covey sought treatment for complaints of back pain at LewisGale Hospital Pulaski on January 25, 2015. (R. at 433-36.) Covey reported chronic back pain since 2002 with an exacerbation when she had twisted her back the previous day. (R. at 433.) The provider noted no radicular symptoms. (R. at 433.) Covey denied any extremity pain or stress or anxiety. (R. at 433.) Straight leg raise tests were negative, and there were no motor or sensory deficits. (R. at 434-35.) Covey's lumbar paraspinal and sacroiliac areas were tender bilaterally. (R. at 435.) Covey was given pain medication and discharged. (R. at 435-36.)

On July 10, 2015, Covey's complaints were similar to her previous visits with Dr. Baylor except that she reported that a shelf fell on her at a store recently. (R. at 313-16.) She also complained of carpal tunnel syndrome in her right wrist, for which she was seeing a hand surgeon. (R. at 313.) On this occasion, Dr. Baylor prescribed Zanaflex and Norco. (R. at 315.) On October 2, 2015, Covey's complaints and Dr. Baylor's findings were consistent with previous reports, except that Dr. Baylor noted

that Covey had undergone carpal tunnel release surgery on her wrists, and she was feeling much better. (R. at 331.) On January 26, 2016, Covey's complaints and Dr. Baylor's findings were consistent with previous reports, except that Dr. Baylor noted that Covey had a cyst removed from her stomach area and had received a prescription for Percocet which she was still taking. (R. at 335.)

On April 21, 2016, Covey saw Dr. Marc A. Swanson, M.D., with Blue Ridge. (R. at 339-42.) Dr. Swanson's notes of Covey's complaints and his findings are similar to Dr. Baylor's recent notes, except that Dr. Swanson noted that Covey had been diagnosed with fatty liver disease and could not take extra strength Tylenol. (R. at 339.) Covey returned to see Dr. Swanson on July 21, 2016, with similar complaints and findings as previously. (R. at 343-46.) Dr. Swanson noted that upon a pill count of Covey's narcotic medication, the pills in her bottle were Tylenol; he stated that Covey insisted this was what she was given by her pharmacy. (R. at 343.) Covey complained of increased pain in her mid back area. (R. at 343.)

Covey returned and saw Dr. Baylor on September 28, 2016, with a new complaint of radicular symptoms in her lower extremities. (R. at 347-49.) Dr. Baylor's findings were unchanged. (R. at 348-49.) On December 2, 2016, Dr. Baylor noted that Covey complained of a pain level of seven on a 10-point scale, and he noted that her pain medication decreased her pain level by 60 percent. (R. at 352.) Covey said that her pain medication allowed her to perform light recreational activities. (R. at 352.) Dr. Baylor noted that Covey was grossly oriented to person, place and time, her communication ability was within normal limits, and she had intact memory, immediate and long-term recall and normal attention and concentration abilities. (R. at 353.) He stated that Covey's judgment and insight were

intact, her rates of thought were normal, thought content was logical, abstract reasoning was within normal limits, her mood was normal, her affect was appropriate and she did not suffer from hallucinations, delusions or psychotic thoughts. (R. at 353.) Dr. Baylor performed a lumbar epidural steroid injection with fluoroscopy on Covey on December 2, 2016. (R. at 350.)

On January 24, 2017, Covey saw Dr. Anthony L. Dragovich, M.D., with Blue Ridge. (R. at 355-57.) Dr. Dragovich noted that Covey's epidural steroid injection gave her about 30 percent relief for about two weeks. (R. at 355.) The results of Dr. Dragovich's neurologic and psychiatric examination was identical to Dr. Baylor's December 2, 2016, findings. (R. at 356-57.)

It is important to note that, over the course of her treatment for pain management with Blue Ridge, Covey consistently denied any sleep problems or anxiety or depression.

On April 21, 2015, state agency physician Dr. R. S. Kadian, M.D., completed a Physical Residual Functional Capacity Assessment of Covey. (R. at 65-66.) On this assessment, Dr. Kadian stated that Covey was capable of lifting up to 50 pounds occasionally and 25 pounds frequently. (R. at 65.) He stated that Covey could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday. (R. at 65.) Dr. Kadian stated that Covey could frequently climb ramps, stairs, ladders, ropes and scaffolds, balance, kneel and crawl and occasionally stoop and crouch. (R. at 66.) He stated that Covey had no manipulative or environmental limitations. (R. at 66.)

On June 23, 2015, Covey saw Mary E. Tekesky, P.A.-C., for complaints of right hand/wrist pain that had been diagnosed as carpal tunnel syndrome. (R. at 365-67.) Covey complained of right wrist pain, numbness and tingling involving all fingers for the previous five years, with symptoms worsening over the previous two to three months. (R. at 365.) Covey said that her pain, at its worst, was a 10 on a 10-point scale. (R. at 365.) Covey said that she had used her father's cockup wrist splint with some improvement. (R. at 365.) At one point, Tekesky's notes state that Covey complained of knee pain, low back pain and sleep trouble; at another point, Tekesky noted that Covey denied knee and low back pain, sleep trouble and feelings of hopelessness. (R. at 365.) Covey identified her occupation as a "stay at home mother." (R. at 365.)

Upon examination, Covey's right wrist was not swollen or tender and had full range of motion and grip strength with positive Tinel's sign[6], Phalen's maneuver[7] and Allen's tests.[8] (R. at 366.) Tekesky noted that Covey reported no problem with her left wrist, and its examination was benign. (R. at 366.) Tekesky diagnosed carpal tunnel syndrome. (R. at 366.) Tekesky ordered x-rays and EMG/NCS testing of Covey's right wrist. (R. at 366.)

---

[6] Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or beginning regeneration of the nerve. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), at 1527 (28th ed. 1994).

[7] Phalen's maneuver reduces the size of the carpal tunnel by holding the hand in a fully flexed or extended position. It is used to detect carpal tunnel syndrome. *See* Dorland's at 985.

[8] Allen's test seeks to determine if there is an obstruction to bloodflow in either the radial or ulnar arteries. *See* Dorland's at 1670.

Covey returned and saw Dr. Anthony A. McPherron, D.O., on July 13, 2015, for follow up after her EMG testing of her right upper extremity. (R. at 363.) Dr. McPherron noted that Covey's EMG testing showed severe carpal tunnel syndrome in her right upper extremity. (R. at 363.) Dr. McPherron noted that his examination showed decreased sensation in Covey's right upper extremity with positive Tinel's sign and Phalen's testing. (R. at 364.) He noted that Covey's gait was mildly antalgic with normal sensation. (R. at 364.) Dr. McPherron recommended carpal tunnel release surgery on Covey's right wrist. (R. at 364.) Dr. McPherron performed a carpal tunnel release on Covey on August 13, 2015[9]. (R. at 428-29.)

Covey returned to see Dr. McPherron on August 28, 2015, two weeks after her right carpal tunnel release surgery. (R. at 360.) Covey complained of expected post-operative pain, but she said the symptoms were improving. (R. at 360.) Covey requested to schedule surgery on her left wrist for the next month. (R. at 360.) Dr. McPherron noted some ecchymosis and swelling in Covey's right wrist, but he stated that wound was clean and dry with no drainage or erythema. (R. at 361.) He noted that palpation to Covey's right wrist bone found no tenderness, but palpation to the soft tissue reveal mild tenderness over the volar wrist crease. (R. at 361.) He noted limited range of motion due to pain. (R. at 361.) He stated that Covey's sensation to light touch was intact in all fingers, and her pulse was normal with good capillary refill. (R. at 361.) Dr. McPherron noted similar findings in Covey's left wrist with negative Finkelstein's test,[10] but positive Tinel's and Phalen's test. (R. at 361.) He

---

[9] The Operative Note stated that Dr. McPherron performed left carpal tunnel release, but his other reports would show that this was Covey's right carpal tunnel release.

[10] Finkelstein's test is the classic provocative test for diagnosis of De Quervain's disease. *See* physio-pedia.com/Finkelstein_Test (last visited Mar. 19, 2020).

removed Covey's sutures in her right wrist and scheduled her for left carpal tunnel release. (R. at 361.)

Dr. McPherron performed carpal tunnel release surgery on Covey on September 17, 2015.[11] (R. at 422-23.) Covey returned to see Dr. McPherron for post-operative examination of her left carpal tunnel release on October 2, 2015. (R. at 358-59.) Covey reported that she was doing well with no complications. (R. at 358.) Dr. McPherron removed her stitches from her left wrist. (R. at 358.) Inspection of Covey's surgical site revealed no swelling and a clean, dry wound with no drainage or erythema, intact sensation in all fingers and good capillary refill. (R. at 359.)

On August 19, 2015, state agency physician Dr. Margaret Burke, M.D., completed a Physical Residual Functional Capacity Assessment of Covey. (R. at 75-76.) On this assessment, Dr. Burke stated that Covey was capable of lifting up to 10 pounds frequently. (R. at 75.) She stated that Covey could stand and/or walk for about two hours and sit for about six hours in an eight-hour workday. (R. at 75.) Dr. Burke stated that Covey could frequently balance, occasionally climb ramps and stairs, stoop, kneel and crouch and never climb ladders, ropes or scaffolds or crawl. (R. at 75-76.) She stated that Covey had no manipulative or environmental limitations. (R. at 76.)

On July 23, 2015, Hillel Raclaw, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Covey, finding she was mildly restricted in her activities of daily living; experienced no difficulties

---

[11] The Operative Note stated that Dr. McPherron performed right carpal tunnel release, but his other reports would show that this was Covey's left carpal tunnel release.

maintaining social functioning; experienced mild difficulties maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 73-74.) Raclaw stated that the record showed that Covey's anxiety was well-controlled with medication and did not impose any significant limitation on her functioning. (R. at 74.)

Covey treated with Melinda Barber, F.N.P., with LewisGale Physicians, from October 17, 2016, to July 10, 2017. (R. 456-79, 484-85.) Covey saw Barber to establish primary care on October 17, 2016, after an earlier emergency department visit for trigeminal neuralgia. (R. at 476.) Covey gave a history of depression, anxiety and chronic back pain. (R. at 476.) Among the medications Covey reported were hydrocodone-acetaminophen, Klonopin, Prozac, Zyprexa, Neurontin and Zanaflex. (R. at 476.) Covey reported that the trigeminal neuralgia had resolved after treatment with Neurontin and steroids. (R. at 477.) Covey denied any memory changes, delusions, insomnia, mania, panic attacks or suicidal thoughts. (R. at 477.) Covey's musculoskeletal examination revealed normal ranges of motion, and normal sensation in her extremities. (R. at 477.) Covey's neurological examination revealed equal extremity strength, intact sensory exam to light touch, normal reflexes, intact coordination and normal gait. (R. at 477.)

Covey returned to see Barber on November 7, 2016, with a complaint of ear pain. (R. at 473-75.) Covey's complaints and Barber's examination were consistent with the previous month's, except that Barber diagnosed recurrent acute suppurative otitis media and referred Covey to an ear, nose and throat specialist. (R. at 473-75.) Covey returned to Barber on November 18, 2016. (R. at 469-71.) Covey reported that the ear, nose and throat physician told her that she suffered from a 30 percent

hearing loss in the right ear and diagnosed her with TMJ syndrome. (R. at 469.) Barber noted that Covey had no teeth, but she reported jaw clenching. (R. at 469.) Covey reported that Neurontin had improved her jaw symptoms, but they had not resolved. (R. at 469.) Barber increased her Neurontin dosage. (R. at 469.) Other than seeking additional treatment for a lipoma on her back, Covey's complaints and Barber's findings were consistent with her earlier visits. (R. at 469-71.)

On March 8, 2017, Covey reported that Prozac did not control her anxiety, and she had difficulty sleeping. (R. at 465.) Barber ordered Covey to taper off Klonopin, and she prescribed trazodone to help with sleep and anxiety. (R. at 465, 467.) Covey report that her trigeminal neuralgia was controlled with Neurontin. (R. at 465.) Except for as stated above, Covey's complaints and Barber's findings were consistent with earlier visits. (R. at 465-68.) Barber did note that Covey's mood and affect were appropriate with no thought disorder. (R. at 467.)

On April 24, 2017, Covey complained of sinus problems, possible kidney stones and swollen feet. (R. at 460-64.) Covey reported little interest or pleasure in doing things, but she denied feeling down, depressed or hopeless. (R. at 460.) She complained of trouble falling or staying asleep, sleeping too much and feeling tired or having little energy. (R. at 460.) Covey denied feeling bad about herself, trouble concentrating or moving or speaking slowly or fidgeting or being restless or having thoughts of being better off dead or hurting herself. (R. at 460.) Barber opined that Covey suffered from minimal depression. (R. at 460.) Covey reported fracturing her left fourth and fifth toes about a month earlier. (R. at 460.) She reported right flank pain for about four days, her trigeminal neuralgia had flared up for the past two days, and she had suffered from kidney stones in the past. (R. at 460.) She also said that

Prozac was not "taking care of her anxiety." (R. at 460.) Other than as stated, Covey's complaints and Barber's findings were consistent with earlier visits. (R. at 460-64.)

Covey returned to see Barber on April 26, 2017, after her lab tests taken on April 24 revealed that she suffered from diabetes. (R. at 456.) Covey was given prescriptions for diabetic medication and testing supplies. (R. at 456.)

When Covey saw Barber on July 10, 2017, she complained of seizure-like activity over the previous two weeks. (R. at 485.) Barber also completed a work assessment from Covey's attorney on July 10, 2017, on which she stated that Covey could sit and stand/walk about two hours in the workday, could never lift and carry 50 pounds, could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds or less. (R. at 481.) Barber stated that Covey's pain and other symptoms were not severe enough to interfere with her attention and concentration. (R. at 481.) Barber stated that Covey was likely to be absent from work about once a month as a result of her impairments or treatment. (R. at 481.) Barber stated that her opinions were only estimations because she was otherwise unable to measure Covey's work-related abilities. (R. at 480.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2019). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A § 1382c(a)(3)(A)-(B) (West 2012); *McLain v, Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Covey argues that the ALJ erred by failing to properly explain his weighing of the medical opinions. (Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-6.) Covey also argues that the ALJ erred by failing to perform a function-by-function analysis of work-related abilities. (Plaintiff's Brief at 6-8.) Covey also argues that the ALJ's finding that she could sit for up to six hours in a workday was not supported by substantial evidence. (R. at 7-8.)

In her second argument, Covey states that the ALJ found that she suffered from a number of severe impairments including carpal tunnel syndrome and obesity. (Plaintiff's Brief at 6-7.) Covey argues that, if an impairment is severe, it necessarily imposes some limitations on a person's work-related abilities. (Plaintiff's Brief at 6.) The ALJ in her case, Covey argues, stated that her carpal tunnel syndrome was considered in limiting her to lifting no more than 10 pounds, but she argues that the ALJ erred when he did not impose any manipulative limitations upon her work-related abilities. (Plaintiff's Brief at 7.) Covey argues that a failure to include such limitation, at the least, should have been explained by the ALJ. (Plaintiff's Brief at 7.)

The ALJ found that Covey had the residual functional capacity to perform sedentary work which required no more than frequent balancing and occasional crouching, kneeling, stooping and climbing ramps and stairs and no climbing ladders, ropes or scaffolds. (R. at 20-23.) Specifically addressing Covey's carpal tunnel syndrome, the ALJ found that the medical evidence showed that Covey had undergone bilateral release surgery with no significant residual symptoms. (R. at 22.) In reaching his residual functional capacity finding, the ALJ stated that he was

giving little weight to the opinion of Nurse Practitioner Barber that Covey was unable to sit, stand and walk a total of eight hours during the workday because it was not supported by the objective evidence. (R. at 22.) In particular, the ALJ noted that Covey's examinations showed that she exhibited a normal gait, ability to stand and intact sensation. (R. at 22.) The ALJ also noted that diagnostic imaging had revealed only minimal degenerative changes. (R. at 22.) Instead, the ALJ chose to credit the opinion of state agency physician Dr. Burke that Covey could perform sedentary work. (R. at 22.)

While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 416.927(c) (2019). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence. …" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 416.927(c)(3) (2019).

Based on my review of the record, I find that the ALJ adequately explained his weighing of the medical evidence. I further find that substantial evidence is contained in the record to support his weighing of the medical evidence and his residual capacity finding. With regard to the ALJ's failure to find any impairment in Covey's manipulation abilities, the record reveals that no physician placed any such limitations on Covey. Instead, the record shows that Covey's bilateral carpal tunnel

release surgeries successfully treated her carpal tunnel syndrome. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Regarding Covey's ability to sit, stand and walk, the only radiographic evidence contained in the record shows that Covey suffered from only minimal degenerative arthritic changes in her lumbosacral spine. (R. at 311.)

For all of the above stated reasons, I find substantial evidence supports the ALJ's weighing of the evidence and his ultimate residual functional capacity finding.

An appropriate Order and Judgment will be entered.

DATED:     March 19, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE